

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-26-2009

# Common Cause PA v. Comm PA

Precedential or Non-Precedential: Precedential

Docket No. 06-3391

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Common Cause PA v. Comm PA" (2009). *2009 Decisions.* Paper 1794.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1794

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
THIRD CIRCUIT
_____

No. 06-3391
_____

COMMON CAUSE OF PENNSYLVANIA; THE
LEAGUE OF WOMEN VOTERS OF
PENNSYLVANIA; REPRESENTATIVE GREGORY
VITALI; TIM POTTS; CARL H. SILVERMAN;
WILLIAM R. KOCH;
H. WILLIAM McINTYRE,

Appellants

v.

COMMONWEALTH OF PENNSYLVANIA; EDWARD
G. RENDELL, Governor; ROBERT P. CASEY III;
DAVID G. ARGALL; DAVID J. BRIGHTBILL; H.
WILLIAM DeWEESE; ROBERT C. JUBELIRER;
ROBERT J. MELLOW; JOHN M. PERZEL; SAMUEL
H. SMITH; MICHAEL VEON; RALPH J. CAPPY

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:05-cv-02036)
District Judge: Honorable Yvette Kane

Before: FLAUM, EBEL and LEVAL, *Circuit Judges.*[*]

(Opinion filed: February 26, 2009)

Eric B. Schnurer, Esq. (Argued)
1690 East Strasburg Road
West Chester, PA 19380-0000
and
Paul A. Rossi, Esq.
316 Hill Street
Mountville, PA 17554-0000
     Attorneys for Appellants

Mark A. Aronchick, Esq.
Wendy Beetlestone, Esq.

---

[*]Honorable Joel M. Flaum, United States Circuit Judge for the Seventh Circuit Court of Appeals, Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit Court of Appeals, and Honorable Pierre N. Leval, United States Circuit Judge for the Second Circuit Court of Appeals, sitting by designation.

Hangley Aronchick Segal & Pudlin
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA 19103-0000
     Attorneys for Appellee Edward G. Rendell

C. Clark Hodgson, Jr., Esq.
Jonathon F. Bloom, Esq.
Thomas W. Dymek, Esq.
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-0000
     Attorneys for Appellees David G. Argall, H.
     William DeWeese, John M. Perzel, Samuel H.
     Smith, and Michael R. Veon

John P. Krill, Jr., Esq. (Argued)
Linda J. Shorey, Esq.
Amy L. Groff, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis
17 North Second Street
18th Floor, Market Square Plaza
Harrisburg, PA 17101-0000
     Attorneys for Appellees David Brightbill and
     Robert C. Jubelirer

James F. Tierney IV, Esq.
Patrick Heffron, Esq.
Eugene F. Hickey II, Esq.
Cipriani & Werner

3

409 Lackawanna Avenue
Suite 210
Scranton, PA 18503-0000
    Attorney for Appellee Robert J. Mellow

Arlin M. Adams, Esq. (Argued)
Paul H. Titus, Esq.
Bruce P. Merenstein, Esq.
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103-0000
and
Howard M. Holmes
Chief Legal Counsel
Administrative Office of Pennsylvania Courts,
1515 Market Street, Suite 1414
Philadelphia, PA 19102-0000
    Attorneys for Appellee Ralph J. Cappy

---

OPINION OF THE COURT
_____

EBEL, *Circuit Judge*.

---

This appeal stems from litigation challenging a short-lived Pennsylvania statute ("Act 44") that increased salaries for state legislators, executive officials and state

4

judges. Plaintiffs are Pennsylvania citizens, a state representative and two organizations—Common Cause and the League of Women Voters. They sued the Commonwealth of Pennsylvania, its governor and treasurer, the General Assembly's leadership, and the Chief Justice of the Pennsylvania Supreme Court, in their individual and official capacities. Plaintiffs allege that, for the past ten years, members of the Pennsylvania Supreme Court have traded judicial decisions favorable to the Pennsylvania General Assembly in return for the legislature's funding the state judiciary. According to Plaintiffs, this arrangement culminated in the General Assembly's enactment of Act 44 in a sleight-of-hand manner during the dead of night. In this litigation, Plaintiffs primarily challenge the manner in which Act 44 was enacted, seeking both declaratory and injunctive relief. Because Plaintiffs allege only general grievances shared by all citizens of Pennsylvania, however, we conclude that they lack standing to pursue the claims they assert. Therefore, having jurisdiction to consider this appeal under 28 U.S.C. § 1291, we AFFIRM the decision of the district court to dismiss Plaintiffs' action in its entirety.

## I. BACKGROUND

Because the district court dismissed Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) and (6), see Common Cause of Pa. v. Pennsylvania, 447 F. Supp. 2d 415, 419 n.1, 422 (M.D. Pa. 2006), we must accept as true all well-pled allegations and construe the complaint in the light most favorable to the plaintiffs, see Lewis v. Atlas

5

Van Lines, Inc., 542 F.3d 403, 405 (3d Cir. 2008) (Rule 12(b)(6)); Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2006) (Rule 12(b)(1) and (6)).

**A.    Factual allegations**

In their second amended complaint, Plaintiffs alleged the following:

**1.    Events leading up to the General Assembly's enactment of Act 44**

The Pennsylvania Constitution provides that

> [t]he judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified judicial system.

Pa. Const., art. V, § 1. Based upon this constitutional provision, Allegheny County, in 1985, sued the Commonwealth, arguing that, contrary to the relevant Pennsylvania statutes enacted by the General Assembly, the Pennsylvania Constitution required the Commonwealth, rather than the County, to fund the County's Court of Common Pleas. See County of Allegheny v. Commonwealth, 534 A.2d 760, 761, 763 (Pa. 1987). The Pennsylvania Supreme Court agreed, holding

6

"that the statutory scheme for county funding of the judicial system is in conflict with the intent clearly expressed in the constitution that the judicial system be unified." Id. at 765. Nevertheless, the Pennsylvania Supreme Court provided that,

> because this order entails that present statutory funding for the judicial system is now void as offending the constitutional mandate for a unified system, we stay our judgment to afford the General Assembly an opportunity to enact appropriate funding legislation consistent with this holding. Until this is done, the prior system of county funding shall remain in place.

Id. (footnotes omitted).

Notwithstanding this mandate from the Pennsylvania Supreme Court, however, the General Assembly declined to act to fund the courts. See Pa. State Ass'n of County Comm'rs v. Commonwealth, 681 A.2d 699, 700-01 (Pa. 1996). After nine years of inaction, the Pennsylvania Association of County Commissioners sought mandamus relief from the Pennsylvania Supreme Court, asking the Court to direct the General Assembly to fund the state's unified court system. See id. The Pennsylvania Supreme Court granted a writ of mandamus: "Pursuant to this writ, jurisdiction is retained and by further order a master will be appointed to recommend to this court a schema which will form the basis for the specific implementation to be ordered." Id. at 703.

7

At about this same time, the General Assembly, contrary to the Pennsylvania Constitution, was generally enacting legislation "in ways that precluded involvement in the legislative process by both the public and the vast majority of legislators." App. at 43. Common Cause, as well as other parties, sued Pennsylvania in state court, challenging the validity of these various legislative enactments.

In 1998 and 1999, the General Assembly negotiated with the Pennsylvania courts over the Commonwealth's funding the court system. Those negotiations resulted in the General Assembly enacting legislation to fund the Commonwealth's unified judicial system in return for the Pennsylvania Supreme Court's judicial decisions upholding the legislation being challenged in state court.

**2.      Enactment of Act 44**

In 2005, the Chief Justice of the Pennsylvania Supreme Court, "in secret," negotiated with state legislators for the enactment of a bill increasing the salaries of the Commonwealth's judges and justices. Eventually, this pay hike was included in legislation that also increased the salaries for legislators and high-level executive branch employees.

House Bill 1521, the bill that would become Act 44, was initially "a 24-line bill" entitled "Relating to Compensation for Executive Branch Officials," which prohibited "any member of the executive branch or any board from receiving compensation greater than that paid to the Governor." App. at 49. The House passed House

8

Bill 1521.  The Senate then amended House Bill 1521, changing it "into a 27-line bill restricting its application to officials elected or appointed to an executive branch position after November 1, 2006."  Id. at 50.  The Senate passed the bill as amended.  The House, however, rejected the revised bill and so House Bill 1521 was referred to a conference committee consisting of three House and three Senate members.  The members of this conference committee, named as defendants in this litigation, included most of the General Assembly's leadership.

"At approximately 2:00 a.m. on July 7, 2005," the conference committee amended House Bill 1521, changing it from a twenty-seven-line bill about compensation for executive officials into "a 22 page bill, providing for massive increases of up to 54% in the salary of every justice and judge of the Pennsylvania Unified Judicial System, every member of the General Assembly, and senior members of the executive branch including the Governor and members of his Cabinet."  Id. at 51.  The revised bill also mandated "that provisions of the Act are nonseverable and if any provision of the Act or its application to any person or circumstance is held invalid, the remaining provisions or applications of the Act are void."  Id. at 65.  According to Plaintiffs, by including this non-severability provision, "the Commonwealth government intentionally created a financial conflict for state court judges to ensure they would not deviate from the negotiated goal of upholding salary increases for all three branches of state government."  Id. at 66.

This revised bill was presented to the Senate and

9

House within "minutes" after being reported out of the conference committee "under a rule prohibiting any amendment." Id. at 52. Both chambers passed the bill. "A few hours later, the Governor signed" the bill "into law," and it immediately took effect.[1] Id. at 53, 66, 317.

### 3.    Reaction to Act 44

"There was a negative public response to [Act 44], focusing particularly upon its timing and method of passage . . . ." Stilp, 905 A.2d at 925. Several state-court actions challenged Act 44's validity. See id. at 926-28. Four months after its enactment, the General Assembly, on November 16, 2005, repealed Act 44 "in its entirety" and reinstated the previous pay scheme ("Act 72").[2] App. at

---

[1]The Pennsylvania Supreme Court later held this legislative process did not violate the Pennsylvania Constitution. See Stilp v. Commonwealth, 905 A.2d 918, 951-59 (Pa. 2006).

[2]Act 72 was intended to decrease all state officials' salaries to pre-Act 44 levels. Because Act 72 repealed Act 44, the district court in this litigation held that Plaintiffs' claims seeking a declaration that Act 44 was unconstitutional were now moot. See Common Cause, 447 F. Supp. 2d at 424.

After the district court dismissed Plaintiffs' case in its entirety, however, the Pennsylvania Supreme Court held (continued...)

10

[2](...continued)
that Act 72 was itself unconstitutional insofar as it decreased judges' salaries. See Stilp, 905 A.2d at 939, 949. Specifically, the court held that Act 72 violated the Pennsylvania Constitution's provision stating that "Justices, judges and justices of the peace . . . shall be compensated by the Commonwealth as provided by law. Their compensation shall not be diminished during their terms of office, unless by law applying generally to all salaried officers of the Commonwealth." Id. at 929-30 (citing Pa. Const. art. V, § 16(a)). The Pennsylvania Supreme Court went on to conclude, however, "our finding of this unconstitutional effect does not taint the remainder of Act 72. Thus, we find that the remainder of Act 72's repeal of Act 44 is valid." Id. at 949.

Because part of Act 44, the portion increasing judges' salaries, thus remained in effect, the Pennsylvania Supreme Court went ahead and addressed the validity of that statute. The court held that the manner in which the General Assembly enacted Act 44 did not violate Pennsylvania's constitution. See id. at 949-59. But Act 44's provision of unvouchered expenses to state legislators—a thinly veiled attempt to permit current legislators to enjoy the Act's pay increase, contrary to state law—was invalid. See id. at 960-70.

The state supreme court then held that,
(continued...)

11

notwithstanding Act 44's express non-severability clause, the Act actually left it to "the Judiciary to make the ultimate determination of severability." Id. at 973. The court then severed the invalid provision of Act 44—the provision of "unvouchered expense[s]" for legislators—from the "otherwise-constitutionally valid remainder of Act 44." Id. at 980-81.

The ultimate result of the Pennsylvania Supreme Court's analysis was "that Act 44's provisions . . . which relate solely to the formula to determine compensation paid to the Judiciary, remain[ed] in force." Id. at 981. The court further noted,

> this Court did not draft or play any role in the enactment of the legislation that became Act 44. That legislation, passed by the General Assembly and duly signed by the Governor, set the compensation judges were to receive, and in July of 2005 the Judiciary began receiving that compensation, only to have the compensation unconstitutionally reduced by Act 72.
>
> The Constitution of Pennsylvania mandates that the Judiciary shall be compensated as provided by law. To
> (continued...)

12

        [2](...continued)
effectuate that constitutional command, we order that the Treasurer of the Commonwealth: (1) shall forthwith calculate judicial compensation in accordance with Act 44, as explained in this Opinion; and (2) shall, upon receipt of vouchers prepared by the Administrative Office of Pennsylvania Courts, reimburse members of the Judiciary for the unconstitutional diminution in compensation effected by Act 72.

Id.

The Pennsylvania Supreme Court's decision in Stilp was entered September 14, 2006. See id. at 918. Ten months later, on July 13, 2007, the Pennsylvania legislature enacted a third statute, Act 30, which replaced the reinstated portions of Act 44 regarding judges' salaries. Apparently in order to avoid the Pennsylvania constitution's prohibition against the legislature reducing the salaries of sitting judges, Act 30 gave the judges a one dollar raise from their salaries as they existed on that date, July 14, 2007, and enacted a new formula for calculating future cost-of-living raises for state court judges. The parties appear to agree that Act 30 repealed the remaining portion of Act 44 reinstated by the Pennsylvania Supreme Court.

(continued...)

53; see Stilp, 905 A.2d at 924-25 & 924 n. 3.

**B.      Procedural posture of this litigation**

Plaintiffs initiated this federal litigation on October 6, 2005, a month before the Pennsylvania legislature repealed Act 44. Plaintiffs amended their complaint once before that repeal, and a second time after the General

---

[2](...continued)

The net result appears to be that, despite the now complete repeal of Act 44, some Pennsylvania judges' salaries remain higher than they were prior to the General Assembly's enactment of Act 44. It is on this basis that Plaintiffs argue that, even though Act 44 has been repealed in its entirety, it made lasting effects on state judges' salaries such that Plaintiffs' claims are not moot. Because we decide this appeal on the basis of standing, we need not address whether Plaintiffs' claims are moot. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180, 189 (2000) (addressing standing before mootness); County of Riverside v. McLaughlin, 500 U.S. 44, 51-52 (1991) (same); United Artists Theatre Co. v. Walton, 315 F.3d 217, 225-26 (3d Cir. 2003) (same). See generally Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (noting that "[m]ootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)") (quotations omitted).

14

Assembly repealed Act 44. In their second amended complaint, Plaintiffs alleged five federal and eight state-law claims, and sought both injunctive and declaratory relief.

Defendants moved to dismiss all of Plaintiffs' claims, under Fed. R. Civ. P. 12(b)(1) and (6), for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.[3] In a very thorough decision, the district court granted Defendants' motions to dismiss Plaintiffs' federal claims. See Common Cause, 447 F. Supp. 2d at 419, 431 n.14. In light of that determination, the court held that it did not need to consider Plaintiffs' pendent state-law claims and, therefore, dismissed Plaintiffs' complaint "in its entirety." Id. at 431 n.14, 438. Plaintiffs appeal the district court's decision dismissing their federal claims.

## II. STANDARD OF REVIEW

The district court held, among other things, that Plaintiffs lacked standing to assert the federal claims they are pursuing in this litigation. See id. at 424-30. "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they

_____

[3]Before the district court, Plaintiffs conceded that the Commonwealth should be dismissed as a party. The district court also dismissed Defendant Treasurer Casey. Plaintiffs do not challenge either of these dismissals on appeal.

must be dismissed." Taliaferro, 458 F.3d at 188. This court reviews "dismissals for lack of standing de novo." Graden v. Conexant Sys. Inc., 496 F.3d 291, 294 n.2 (3d Cir. 2007), cert. denied, 128 S. Ct. 1473 (2008); see also Goode v. City of Philadelphia, 539 F.3d 311, 316 (3d Cir. 2008).

> In an appeal from a grant of a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), we review only whether the allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court. Challenges to subject matter jurisdiction under Rule 12(b)(1) may be facial or factual. Facial attacks, like this one, contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true.

Taliaferro, 458 F.3d at 188 (citations, quotations omitted). Further, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant[s'] conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (quotation, alterations omitted); see also Pa. Prison Soc'y v. Cortes, 508 F.3d 156, 161 (3d Cir. 2007).

Plaintiffs, as the parties invoking the federal courts'

16

jurisdiction, bear the burden of establishing their standing. See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 (2006).

### III. STANDING

#### A.  General standing principles

Standing implicates both constitutional requirements and prudential concerns.  See Kowalski v. Tesmer, 543 U.S. 125, 128 (2004).

> In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.  The standing requirement is born partly of an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004) (quotations, citations omitted).  A federal court "[a]lways . . . must balance the heavy obligation to exercise jurisdiction against the deeply rooted commitment not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary." Id. (quotations, citations omitted).  Thus, Article III's standing requirement "is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power."  Valley Forge Christian

17

Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 476 (1982).  Invoking the power of the federal judiciary requires more than important issues and able litigants.  See id. at 489-90.

### 1.    Constitutional standing requirements

"Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'  That case-or controversy requirement is satisfied only where a plaintiff has standing."  Sprint Commc'ns Co. v. APCC Servs., Inc., 128 S. Ct. 2531, 2535 (2008); see also Valley Forge Christian Coll., 454 U.S. at 471.

> [I]n order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (i.e., a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (i.e., a "fairly traceable" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

Sprint Commc'ns Co., 128 S. Ct. at 2535 (quoting Lujan, 504 U.S. at 560-61) (further quotation, alterations omitted); see also Cortes, 508 F.3d at 161.  "In this manner does Art. III limit the federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers and which are

18

traditionally thought to be capable of resolution through the judicial process.'" Valley Forge Christian Coll., 454 U.S. at 472 (quoting Flast v. Cohen, 392 U.S. 83, 97 (1968)). "Determining that a matter before the federal courts is a proper case or controversy under Article III therefore assumes particular importance in ensuring that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society." DaimlerChrysler Corp., 547 U.S. at 341 (quotation omitted). "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Id. (quotations omitted). "If a dispute is not a proper case or controversy, the courts have no business deciding it . . . ." Id.

Of particular relevance to this case, a plaintiff must allege an actual, concrete injury. See Sprint Commc'ns Co., 128 S. Ct. at 2535; Lujan, 504 U.S. at 560. It is not enough to assert a generalized, abstract grievance shared by a large number of similarly situated people. See Valley Forge Christian Coll., 454 U.S. at 482-83 (citing cases). We go on to discuss prudential standing.

## 2. Prudential standing requirements

In contrast to constitutional standing, prudential standing "embodies judicially self-imposed limits on the exercise of federal jurisdiction." Elk Grove Unified Sch. Dist., 542 U.S. at 11 (quotation omitted). Although the Supreme Court has

not exhaustively defined the prudential

19

dimensions of the standing doctrine, [the Court has] explained that prudential standing encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

Id. at 12 (quotation omitted); see also Valley Forge Christian Coll., 454 U.S. at 474-75; Twp. of Piscataway v. Duke Energy, 488 F.3d 203, 209 (3d Cir. 2007).

Without such limitations–closely related to Art. III concerns but essentially matters of judicial self-governance–the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.

Elk Grove Unified Sch. Dist., 542 U.S. at 12 (quotation omitted).

Of import in this case, then, "even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III, the [Supreme] Court has refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,'

20

pervasively shared and most appropriately addressed in the representative branches." Valley Forge Christian Coll., 454 U.S. at 474-75 (quoting Warth v. Seldin, 422 U.S. 490, 499-500 (1975)).

### 3.    Generalized grievances

"Whether styled as a constitutional or prudential limit on standing, the [Supreme] Court has sometimes determined that where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance." Fed. Election Comm'n v. Akins, 524 U.S. 11, 23 (1998) (citing cases).  Based upon this reasoning, the Supreme "Court repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law." Valley Forge Christian Coll., 454 U.S. at 482-83 (quotation, alteration omitted; citing cases); see also Massachusetts v. E.P.A., 549 U.S. 497, 516-17 (2007) ("We will not . . . entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws."); Lance v. Coffman, 549 U.S. 437, 442 (2007) (per curiam) (noting that the "[t]he only injury plaintiffs allege is that the law . . . has not been followed.  This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past."); Lujan, 504 U.S. at 573-74 ("We have consistently held that a plaintiff raising only a generally available grievance about government–claiming only harm to his and every citizen's interest in proper application of the

21

Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large–does not state an Article III case or controversy."); id. at 573-77 (citing cases); Goode, 539 F.3d at 322 (holding taxpayers lacked standing to assert claims based upon generalized injury that all persons in Philadelphia suffered); Cortes, 508 F.3d at 164 (holding voters and taxpayers lacked standing to assert a "generalized grievance[] of concerned citizens"); Taliaferro, 458 F.3d at 185, 190 (holding homeowners lacked standing to assert generalized challenge to local zoning ordinance); Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 120-21 (3d Cir. 1997) (holding plaintiffs lacked standing to assert generalized claim that they were injured by knowing that creek was being polluted).

Such claims amount to little more than attempts "to employ a federal court as a forum in which to air . . . generalized grievances about the conduct of government." Valley Forge Christian Coll., 454 U.S. at 479 (quotation, alteration omitted). Therefore, "assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." Id. at 483.

This reasoning "invariably appears in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature—for example, harm to the common concern for obedience to law." Akins, 524 U.S. at 23 (quotation omitted). "The abstract nature of the

22

harm—for example, injury to the interest in seeing that the law is obeyed–deprives the case of the concrete specificity . . . which . . . prevents a plaintiff from obtaining what would, in effect, amount to an advisory opinion." Id. at 24. "Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the [Supreme] Court has found 'injury in fact.'" Id.; see also Massachusetts v. E.P.A., 549 U.S. at 517; Goode, 539 F.3d at 322 (noting in that case that "[a]ppellants lack standing, . . . not because the alleged injuries they suffer are widely felt, but because their injuries are no different in nature from the general interest in enforcing compliance with the law which the public shares").

In this appeal, Plaintiffs argue they are not asserting generalized grievances, but are instead alleging the deprivation of "personal rights" under the First, Fifth and Fourteenth Amendments. Even so, Plaintiffs must allege that they directly suffered an actual injury to those rights. See Valley Forge Christian Coll., 454 U.S. at 482-87; see also Goode, 539 F.3d at 315, 320-22 & 322 n.7 (applying same standing analysis to a citizen taxpayer's claims alleging the deprivation of rights under the First, Fifth and Fourteenth Amendments to access the courts and to petition the legislature, and thus requiring plaintiff to establish an actual and direct injury to her rights in order to have standing).

### 4.     Plaintiffs' status

23

The named plaintiffs include four individuals—Tim Potts, Carl H. Silverman, William R. Koch and H. William McIntyre—who are Pennsylvania residents, citizens and taxpayers. Plaintiff Greg Vitali is a citizen and taxpayer in Pennsylvania. He is also a member of the Pennsylvania House of Representatives who voted against Act 44.[4]

Two of the plaintiffs—Common Cause of Pennsylvania and the League of Women Voters—are associations. Common Cause "is a national non-partisan citizen advocacy organization concerned with advancing integrity in government. Common Cause's primary goal is governmental accountability and responsiveness, which it promotes through lobbying, oversight, education, outreach

---

[4]In their second amended complaint, Plaintiffs alleged that each of the named plaintiffs, both individuals and associations alike, are taxpayers as well as citizens and residents of Pennsylvania. Nevertheless, Plaintiffs expressly do not rely on their status as taxpayers to establish their standing to assert the claims they pursue in this litigation. Accordingly, we do not reach the issue, although we note that under the present thinking of a majority of the Supreme Court, Plaintiffs would appear not to have standing as taxpayers under the circumstances alleged here. See Hein v. Freedom from Religion Found., Inc., 127 S. Ct. 2553 (2007) (plurality); see also 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.10.1 (3d ed. 2008).

24

and litigation programs." App. at 33. "Common Cause of Pennsylvania has over 10,000 members in Pennsylvania." Id.

Plaintiff League of Women Voters of Pennsylvania "is a membership based, non-partisan, non-profit corporation organized under the laws of Pennsylvania. The League's purpose is to promote the informed and active participation of citizens in their government." Id. at 34. Its "membership consists of [Pennsylvania] citizens, taxpayers, and voters." Id.

An association's or organization's standing presents special considerations.

> [A]n organization or association may have standing to bring suit under two circumstances. First, an organization may be granted standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the organization or association itself may enjoy. Alternatively, an association may assert claims on behalf of its members, but only where the record shows that the organization's individual members themselves have standing to bring those claims.

Cortes, 508 F.3d at 162-63 (citations, alterations omitted); see also Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002). Thus, "an organization may sue to redress its members' injuries, even

25

without a showing of injury to the association itself." United Food & Comm'l Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 552 (1996).

"'[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Id. at 553 (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)); see also Pa. Psychiatric Soc'y, 280 F.3d at 283. The first requirement, "that at least one of the organization's members would have standing to sue on his own, is grounded on Article III as an element of the constitutional requirement of a case or controversy." United Food & Comm'l Workers Union Local 751, 517 U.S. at 554-55 (quotation omitted). The second prong

> is, at the least, complementary to the first, for its demand that an association plaintiff be organized for a purpose germane to the subject of its member's claim raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary.

Id. at 555-56. The third prong, on the other hand, is prudential in nature, rather than a constitutional requirement. See id. at 556-57.

26

In this case, the two Plaintiff associations base their standing solely on injuries suffered by their members. Therefore, because Plaintiffs Common Cause and the League of Women Voters have "alleged no injury to [themselves] as an organization, distinct from injury to [their] taxpayer members," their

> claim to standing can be no different from those of the members [they] seek[] to represent. The question [presented, then,] is whether [their] members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.

Valley Forge Christian Coll., 454 U.S. at 476 n.14 (quotation omitted). Because the standing of the two Plaintiff associations thus rests on the standing of their members, and because Plaintiffs allege that the associations' members suffered the same injury as the individual plaintiffs, save perhaps Representative Vitali, we will address the associations' standing together with that of the individual plaintiffs.

**B.    Plaintiffs' claims**

The standing inquiry "often turns on the nature and source of the claim asserted." Raines v. Byrd, 521 U.S. 811, 818 (1997) (quotation omitted). Therefore, "[i]n determining whether appellants have standing, we must consider their specific allegations and the relief which they seek." Goode, 539 F.3d at 316 (citing City of Los Angeles

27

v. Lyons, 461 U.S. 95, 105-06 (1983)). Although in their second amended complaint, Plaintiffs originally alleged five federal claims, on appeal they continue to pursue only three of those five claims.[5]

---

[5]Plaintiffs' first federal claim, entitled "Conspiracy to Violate Civil Rights," alleged that Defendants John Perzel, the Pennsylvania house speaker, and Robert Jubelirer, the state senate president, conspired with "unknown members of the Pennsylvania Supreme Court to be later named as Defendants" to enact Act 44, in violation of the Pennsylvania Constitution, by exchanging "illegally negotiated legislative outcomes . . . for decisions by the Pennsylvania Supreme Court desired by legislative Defendants." App. at 67. The second amended complaint further alleged generally that these Defendants also conspired to authorize legislation enacted in violation of the Pennsylvania Constitution. Plaintiffs asserted this claim under 42 U.S.C. §§ 1983, 1985. In their appellate briefs, however, Plaintiffs do not ever mention this conspiracy claim. Therefore, we deem Plaintiffs to have abandoned it. See Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir. 1993).

Plaintiffs' second federal claim alleged that the fact that Defendants included a non-severability clause in Act 44 deprived Plaintiffs of due process because that clause denied Plaintiffs "a fair hearing before an impartial tribunal." App. at 68. Plaintiffs, however, do not reassert
(continued...)

28

### 1. The state judiciary's involvement in the legislative process deprived Plaintiffs of due process

In their second amended complaint, Plaintiffs alleged only that Defendants deprived Plaintiffs of due process when Defendants "engaged in private conversations on legislative matters with one or more justices of the Pennsylvania Supreme Court that might come before the court." App. at 69. The district court held that Plaintiffs lacked standing to assert this claim. See Common Cause, 447 F. Supp. 2d at 426-30. We agree. Clearly these allegations, which challenge the legislative process, are insufficient to allege more than a generalized, abstract grievance, shared by all Pennsylvania citizens. The complaint does not attempt to identify an actual, concrete injury that this conduct caused any of the named Plaintiffs. Cf. Goode, 539 F.3d at 315, 320-22 (dismissing taxpayers' access-to-court claim because their alleged "injuries are no different in nature from the general interest in enforcing compliance with the law which the public shares").

For the first time on appeal, Plaintiffs attempt to focus on the potential state judicial process, arguing that Defendants' actions deprived Plaintiffs of due process, and

---

[5](...continued)
any challenge to the non-severability clause itself on appeal. Therefore, we also deem that specific claim abandoned. See Kost, 1 F.3d at 182.

specifically an impartial decisionmaker, because (1) Act 44 gave the judiciary a pecuniary interest in any litigation challenging that Act; (2) the judiciary participated in creating the challenged legislation; and (3) the Pennsylvania Chief Justice[6] negotiated with the legislature for the predetermined result of any later court challenges to Act 44 brought before the Pennsylvania Supreme Court. A litigant generally cannot create standing through new allegations asserted for the first time on appeal. See Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 297 (3d Cir. 2003); see also In re Mystic Tank Lines Corp., 544 F.3d 524, 528 (3d Cir. 2008) (noting "[t]his court has consistently held that it will not consider issues that are raised for the first time on appeal," absent "exceptional circumstances"). Even considering these new allegations, however, Plaintiffs have still failed to establish that they suffered an actual injury from this challenged conduct sufficient to give them standing.

For example, Plaintiffs do not allege that they ever challenged Act 44 in state court and that, in doing so, they were deprived of an impartial decisionmaker. Instead, they allege, in the abstract, that if Plaintiffs had brought suit in Pennsylvania courts challenging Act 44, they would not have had an impartial decisionmaker: "The Appellants

_____

[6]Plaintiffs, on appeal, make this allegation against a named defendant, Chief Justice Cappy, as well as against unnamed "other Justices" of the Pennsylvania Supreme Court. See Aplt. Br. at 35 n.7, 36-37.

30

here, who have challenged such enactments before and could be expected to do so again, were thereby denied any chance of the constitutionally required access to an impartial tribunal, and thus due process of law, in state court." Aplt. Br. at 16. That is not sufficient to state the actual or imminent injury necessary for constitutional standing. See Massachusetts v. E.P.A., 549 U.S. at 517; Lujan, 504 U.S. at 560-61.

Further, Plaintiffs go on to articulate this claim as follows:

> The Appellants—in fact, all Pennsylvanians—started with state constitutional rights to an open and deliberative legislative process guaranteed them by Article III of the state constitution; these rights . . . have consistently been found to be justiciable and defensible in the Pennsylvania courts, and thus the plaintiffs here also possessed a legal right to bring suit in state court to challenge the deprivation of their Article III rights by the passage of Act 44 and other legislation challenged in the past or potentially challengeable at the time of these events.

Aplt. Br. at 40 (emphasis added); see also id. at 24 (arguing Defendants, who are "leading figures of the Pennsylvania state government[,] attempted systematically to deny [a neutral and disinterested decision maker] to the people of their Commonwealth"); id. at 37-38 (asserting

31

"the Chief Justice and potentially other Justices agreed before the pay-raise legislation was even enacted that the state courts would uphold it . . . against legal challenge by <u>any</u> citizens") (emphasis added). These arguments highlight the fact that Plaintiffs are asserting only a generalized, abstract grievance held by "all Pennsylvanians." Plaintiffs have, thus, failed to allege that they have directly suffered a personalized, actual or imminent injury, as Article III requires.

For all of these reasons, we conclude the district court did not err in dismissing Plaintiffs' due process claim because they lacked standing to assert it.

**2. The truncated legislative process underlying the General Assembly's enactment of Act 44 deprived Plaintiffs of equal protection and due process**

Plaintiffs, in their second amended complaint, next challenged the manner in which the General Assembly enacted Act 44, alleging that Defendants, by "implement[ing] a truncated legislative process, as part of a continuing pattern of illegal statutory enactment," deprived Plaintiffs of both due process and equal protection. App. at 69-70. The district court held that Plaintiffs lacked standing to assert this claim, as well. <u>See Common Cause</u>, 447 F. Supp. 2d at 426-30. Again, we agree. Plaintiffs failed to allege how this legislative process actually injured them directly. Instead, they alleged a generalized, abstract grievance shared by all Pennsylvanians.

32

On appeal, Plaintiffs assert only an equal protection claim. Thus, we deem them to have abandoned any due process challenge to the manner in which the General Assembly enacted Act 44, although our conclusion that Plaintiffs lack standing would equally bar Plaintiffs' due process claim had it been preserved. See Kost, 1 F.3d at 182.

For the first time on appeal, Plaintiffs make additional allegations to support their standing to challenge the way Act 44 was enacted. They also differentiate the grounds on which the citizen plaintiffs have standing from the basis for Representative Vitali's standing.

Again, Plaintiffs generally cannot create standing through new allegations asserted for the first time on appeal. See Storino, 322 F.3d at 297; see also In re Mystic Tank Lines Corp., 544 F.3d at 528. Nonetheless, even considering these additional allegations, Plaintiffs have failed to establish that they have constitutional standing to pursue this equal-protection challenge to the procedures by which the General Assembly enacted Act 44.

On appeal, Plaintiffs contend that

the extra-legal process designed by [Defendants] to enact Act 44, in which a select few legislators were the only ones allowed–secretly–to draft, propose or alter even a single word of the legislation, deprived the vast majority of legislators, including Appellants['] Representative

33

> [Plaintiff] Greg Vitali, and their constituents such as Appellants of equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

Aplt. Br. at 43. More specifically, Plaintiffs argue on appeal that Defendants deprived them of equal protection by assigning the original house bill to a conference committee, composed of only named Defendants, which completely redrafted the original house bill in secret, and then submitted it to the General Assembly under a rule prohibiting any of the other legislators from amending the submitted bill.

> As a result [Defendants] ensured that they and only they were able to exercise the full panoply of legislative functions in drafting, debating and amending the text of the Act, while consigning [Plaintiff] Representative Greg Vitali and the elected representatives of the remaining Appellants to a mere up-or-down vote on final passage. A small class of legislators thus was given the abilities constitutionally appertaining to membership in the General Assembly to draft, discuss, debate, and amend the legislation at issue—all others were completely and expressly denied such ability.

Id. at 44.

Because Plaintiffs differentiate between Representative Vitali's standing and that of the other

34

citizen Plaintiffs, we will address Vitali's standing separately.[7]

---

[7]In their complaint, Plaintiffs never suggested that Vitali suffered any injury, as a state legislator, that was different from any injury suffered by the citizen plaintiffs. But in their brief to the district court opposing Defendants' motions to dismiss, Plaintiffs did suggest that Vitali had standing based upon his being a legislator:

> Plaintiff Greg Vitali is a member of the General Assembly and was personally excluded from his right to participate, as an elected representative of the 166th state legislative district, in the legislative process required by the state constitution. A process bypassed by individual defendants to this action resulting in the violation of Plaintiff Vitali's right to free speech, due process and equal protection of the laws guaranteed by the federal constitution.

App. at 191-92. However, in that brief, when Plaintiffs addressed the specifics of their equal protection claim, Plaintiffs never alleged that the manner in which Act 44 was enacted specifically deprived Vitali of equal protection of the law on any basis different from that alleged to have involved the other citizen plaintiffs. Id. at 216-22. Thus, this claim suffers the additional fatal defect

(continued...)

35

### a. Plaintiff Vitali's standing

"'[L]egislators, like other litigants in federal court, must satisfy the jurisdictional prerequisites of Article III standing.'" Goode, 539 F.3d at 317 (quoting Russell v. DeJongh, 491 F.3d 130, 133 (3d Cir. 2007) (alteration omitted)).

> Concerns for separation of powers and the limited role of the judiciary are at the core of Article III standing doctrine and the requirement that a plaintiff allege an injury in fact. Those concerns are particularly acute in legislator standing cases, and they inform the analysis of whether a legislator plaintiff has asserted an injury in fact sufficient to confer standing to sue.

Russell, 491 F.3d at 133.

On appeal, Plaintiffs suggest that Defendants deprived Vitali of equal protection of the law by denying him, and other legislators, the ability to discuss, debate and perhaps amend Act 44 before having to vote on that legislation. As Plaintiffs point out in their brief, state legislators have, under different circumstances, sued based upon a direct injury suffered by that particular legislator. For instance, in Bond v. Floyd, state representative Julian Bond sued the Georgia legislature, seeking declaratory and

---

[7](...continued)
that it was not adequately raised below.

36

injunctive relief that would permit him to take his seat in the Georgia legislature, after that body excluded him for comments Bond made against the Vietnam War, among other things. See 385 U.S. 116, 118, 125-26 (1966). Similarly, in Ammond v. McGahn, a New Jersey state senator, Alene Ammond, a Democrat, sued the Democratic senate caucus after the caucus excluded her for making negative remarks about the caucus. See 390 F. Supp. 655, 657 (D. N.J. 1975), rev'd on other grounds, 532 F.2d 325, 329 (3d. Cir. 1976); see also Parker v. Merlino, 646 F.2d 848, 849, 851-52 (3d Cir. 1981) (concluding, without addressing standing, that there was no merit to the claim asserted by several state legislators that other legislators violated their First and Fourteenth Amendment rights by terminating the opportunity for further debate before the legislature voted on two pending bills); Gewertz v. Jackman, 467 F. Supp. 1047, 1050, 1055-56 (D. N.J. 1979) (holding federal court had authority to consider state legislator's claim challenging the Democratic caucus's decision to remove him from the Appropriations Committee; noting that, although the legislator's claim implicated operations of the state's legislative body, the federal court was "require[d]" to consider this individual legislator's claim "that his constitutional rights have been violated by the legislature or its leaders"); see Davids v. Akers, 549 F.2d 120, 122-23 (9th Cir. 1977) (considering merits of claims brought by state legislators challenging the committee appointments made by the state house speaker).

In each of these cases, the courts addressed the

merits of these claims brought by individual state legislators without specifically discussing whether those legislators had standing to assert those claims. However, the Supreme Court has "repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect." Lewis v. Casey, 518 U.S. 343, 352 n.2 (1996); see also Fed. Election Comm'n v. NRA Political Victory Fund, 513 U.S. 88, 97 (1994); United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37-38 (1952). See generally Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 91 (1998) (noting that Supreme Court has "often said that drive-by jurisdictional rulings . . . have no precedential effect").

In this case, in any event, Vitali does not allege that he has suffered a direct and concrete injury specific to him, as a result of Defendants' challenged conduct. Rather, he challenges a procedure that excluded most of the Pennsylvania legislators.

Other cases, also relied upon by Plaintiffs, have concluded that a legislator has standing to challenge the nullification of his particular vote.

> [L]egislators have a legally protected interest in their right to vote on legislation and other matters committed to the legislature, which is sometimes phrased as an interest in "maintaining the effectiveness of their votes." Not every affront to a legislator's interest in the effectiveness of his vote, however, is an injury in fact sufficient to confer standing to

38

sue.

<u>Russell</u>, 491 F.3d at 134 (citing cases).  For example,

> courts have drawn a distinction . . . between
> a public official's mere disobedience of a law
> for which a legislator voted–which is not an
> injury in fact–and an official's "distortion of
> the process by which a bill becomes law" by
> nullifying a legislator's vote or depriving a
> legislator of an opportunity to vote–which is
> an injury in fact.

<u>Id.</u> at 135.

Cases where a public official has directly injured a particular legislator by nullifying his vote, however, involve circumstances much different than those alleged here.  <u>See</u> <u>id.</u> at 135-36 & 135 n.4 (citing cases); <u>cf.</u> <u>Bender v. Williamsport Area Sch. Dist.</u>, 475 U.S. 534, 544 & n.7 (1986) (noting, in dicta, that a lone dissenting school board member might have standing to assert a claim seeking to maintain the effectiveness of his vote, if state law required a unanimous board vote and the rest of the board, nevertheless, acted without the dissenting member's consent).

The Third Circuit addressed several such cases in <u>Russell</u>, 491 F.3d at 135-36.  There, this court noted, for example, that <u>Coleman v. Miller</u>, 307 U.S. 433 (1939), "'stands, at most, for the proposition that legislators <u>whose votes would have been sufficient to defeat (or enact) a specific legislative Act</u> have standing to sue if that

39

legislative action goes into effect (or does not go into effect) on the ground that their votes have been completely nullified.'" Russell, 491 F.3d at 135 n.4 (quoting Raines, 521 U.S. at 823) (emphasis added); see also Baird v. Norton, 266 F.3d 408, 411-13 (6th Cir. 2001).

And in Dennis v. Luis, 741 F.2d 628 (3d Cir. 1984), the Third Circuit

> held that a group of legislators had standing to challenge the appointment by the Governor of the Virgin Islands of an "acting" Commissioner of Commerce without consulting them, where § 16(c) of the Organic Act, 48 U.S.C. § 1597(c), provided that the appointment of a Commissioner of Commerce was subject to the advice and consent of the Legislature. The plaintiffs in Dennis thus alleged that they possessed a specific right under § 16(c) of the Organic Act that the Governor had violated, and they had no clear recourse through the political process.

Russell, 491 F.3d at 135 n.4.

Further, in Silver v. Pataki, 755 N.E.2d 842 (N.Y. App. 2001),

> the New York Court of Appeals recognized an injury in fact when a state assembly member alleged that the governor made illegal use of his line item veto power by

40

using it on bills that were not lawfully subject to the line item veto. The state assembly member had voted in favor of the bills in question, and the New York Court of Appeals held that the plaintiff had standing. . . . In Silver, the Governor's veto nullified the pending bills and forced the assembly member to try [to] persuade a supermajority of his colleagues to override the governor's veto if he wished to restore the status of the bills as law.

Russell, 491 F.3d at 135 n.4.

The circumstances alleged in this case are much different. Here, Representative Vitali was not precluded from voting on Act 44. Cf. id. at 135-36 (concluding legislator, asserting claim that Governor violated applicable deadlines in nominating justices of the Virgin Islands Supreme Court, did not allege that his ability to vote had been nullified where the legislator was still able to "confirm, reject, or defer voting on the Governor's nominees"). Nor has Vitali alleged that his vote was in any other way nullified. At most, Vitali merely alleges he was denied full input on the drafting and consideration of Act 44. But the denial was not specific to him; rather, its impact was felt by all legislators other than the select leadership. However, the legislative process inevitably involves a division of responsibilities, and leadership necessarily will have greater input in legislation being considered.

41

For these reasons, we conclude that Vitali has failed to allege that the manner in which the General Assembly enacted Act 44 actually and concretely injured him in particular. Even if Vitali had alleged such an injury (which we conclude he has not), Vitali has also failed to satisfy prudential standing concerns. Vitali's challenge to the manner in which the General Assembly enacted Act 44 is a clear example of one of those "'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches" which the Supreme Court counsels federal courts to avoid adjudicating. Valley Forge Christian Coll., 454 U.S. at 474-75 (quoting Warth, 422 U.S. at 499-500); see also 13B Charles Alan Wright, Arthur Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.11.3 (3d ed. 2008) (noting that "most disagreements among state legislators will involve matters of state law, or issues of federal law that cannot be disentangled from the political functions of the legislature. Standing should be denied as to the federal questions, for reasons of federalistic deference to state legislatures that mirror the separation-of-powers deference to Congress").

For these reasons, the district court did not err in concluding Plaintiff Vitali lacked standing to challenge the manner in which the General Assembly enacted Act 44.

### b. Citizens Plaintiffs' standing

On appeal, the citizen Plaintiffs (and the associations whose members are Pennsylvania citizens)

42

allege that their elected state representatives were, like Representative Vitali, precluded from drafting, debating and amending Act 44. The New Jersey district court has suggested that a state legislator's constituents might be able to assert such a claim:

> The action by the Caucus in denying Senator Ammond the opportunity to attend its deliberations deprived her constituents of the Equal Protection of the law. In effect, the action by the Caucus created two classes of voters. One class consists of those citizens whose Senators could effectively participate fully in the legislative process and another class whose Senator could participate only to a limited degree.

Ammond, 390 F. Supp. at 660.

Even if we were to adopt the District of New Jersey's reasoning, however, the citizen Plaintiffs in this case are able to assert only a generalized, abstract grievance shared by most Pennsylvanians—that Defendant legislators denied Plaintiffs' representatives the equal opportunity to draft, debate and amend Act 44 before voting on that bill. See App. at 277 (Plaintiffs arguing to the district court that Defendants, through "their mechanism by avoiding the legislative process mandated by the Pennsylvania Constitution, . . . cut out the vast majority of the representatives and the people of Pennsylvania from the deliberative processes of the General Assembly. These are representational rights that

43

are personal to every citizen in this state.") Such injury is insufficient to confer constitutional standing.

And even if they had established constitutional standing (which we conclude they did not), the citizen Plaintiffs cannot satisfy prudential standing concerns. See Valley Forge Christian Coll., 454 U.S. at 474-75.

### c. Conclusion

It is clear that, before the district court, all of the Plaintiffs failed to establish their standing under Article III to pursue their due process/equal protection claim challenging the manner in which the General Assembly enacted Act 44. For the first time on appeal, Plaintiffs make additional standing arguments. Nevertheless, even if we were to consider those newly raised arguments, Plaintiffs have ultimately still failed to meet their burden of alleging that they suffered an actual and concrete injury sufficient to support constitutional standing. Nor can Plaintiffs satisfy prudential standing concerns. For all of these reasons, this court affirms the district court's decision to dismiss Plaintiffs' due process/equal protection challenge to the process by which Act 44 was enacted.

### 3. First Amendment right to petition government

As their final federal claim, Plaintiffs alleged in their second amended complaint that Defendants, in enacting Act 44 in the manner they did, deprived Plaintiffs of their First and Fourteenth Amendment "freedom of speech to lobby their elected state representatives

44

concerning passage of House Bill 1521 before it was enacted into law as Act 44." App. at 70. Specifically Plaintiffs alleged that

> Defendants, acting at all times under color of state law, implemented the legislative process used to enact Act 44, as part of a continuing pattern of illegal statutory enactment, thereby depriving Plaintiffs [of] their right to freedom of speech to lobby their elected state representatives concerning passage of House Bill 1521 before it was enacted into law as Act 44, as guaranteed by the First and Fourteenth Amendments to the United States Constitution, as more fully described in the preceding paragraphs, all in violation of 42 U.S.C. § 1983, for which the individual Defendants are individually liable.

Id. In the "preceding paragraphs" of the complaint, Plaintiffs further asserted that

> [t]he truncated legislative process used by the Leaders [of the General Assembly] to enact Act 44, and the early morning hour at which it was triggered, intentionally inhibited Plaintiffs['] ability to receive timely information regarding proposed government actions necessary to exercise their First Amendment right of free speech to support or oppose the Senate-House conference committee's new version of House Bill 1521

45

> before it was enacted by the General
> Assembly into law.

Id. at 56.[8]  The district court held that Plaintiffs lacked standing to assert this claim because they alleged only a generalized, abstract grievance shared by all Pennsylvanians.  See Common Cause, 447 F. Supp. 2d at 426-30.  Plaintiffs reiterate these same arguments on appeal.[9]

On appeal, Plaintiffs expand their First Amendment claim to encompass the alleged secret discussion of Act 44 that occurred between officials of the three branches of Pennsylvania's government, prior to the enactment of that

---

[8]On appeal, Plaintiffs make clear that they are not challenging the late hour at which the General Assembly considered Act 44: "Appellants do not allege that the Petition Clause prevents a state legislature from round the clock legislative sessions or constrains a legislature from enacting laws to times convenient to a citizen's right to petition government."  Aplt. Br. at 61.

[9]Defendant Chief Justice Cappy complains that Plaintiffs, before the district court, alleged only a violation of their First Amendment freedom of speech and to lobby.  According to Cappy, it is only in their appellate briefs that Plaintiffs expressly assert the deprivation of their freedom to petition the Government.  It appears, however, that the gist of Plaintiffs' claim before the district court remains the same now on appeal.

legislation. Again, Plaintiffs generally cannot create standing through new allegations asserted for the first time on appeal.[10] See Storino, 322 F.3d at 297; see also In re Mystic Tank Lines Corp., 544 F.3d at 528.

Even considering all of these allegations, however, Plaintiffs have failed to allege that they in particular were actually and concretely injured by Defendants' challenged conduct. Instead, Plaintiffs continue to allege only a general, abstract grievance shared by all Pennsylvanians.

---

[10]For the first time in their appellate reply brief, Plaintiffs allege that, at approximately 10:00 p.m. on July 6, 2005, citizen Plaintiff Potts contacted the executive director of Plaintiff Common Cause to find out if the General Assembly was to consider "anything of note" that night. Aplt. Reply Br. at 32 n.18. If so, Potts intended to "exercise his right to petition." Id. The executive director of Common Cause "made inquiries within the General Assembly and he was assured nothing of import or surprising would occur that night." Id. The Common Cause executive director informed Potts, who then "left on vacation." Id. The General Assembly enacted Act 44 at 2:00 a.m. the following morning. Because Plaintiffs waited until their appellate reply brief to make these allegations, we do not consider them. See United States v. Pellulo, 399 F.3d 197, 222 (3d Cir. 2005) (holding appellant ordinarily may not raise issue for the first time in a reply brief, absent exceptional circumstances); see also Storino, 322 F.3d at 297.

47

To illustrate this point, Plaintiffs specifically alleged in their complaint that "[t]he Leaders [of the General Assembly] intentionally deprived Plaintiffs, and the entire Pennsylvania electorate, of any notice of the text of House Bill 1521 . . . before it was enacted into law by a legislative process lasting a few hours in the very early morning." App. at 56 (emphasis added). And on appeal, Plaintiffs argue that

> the Petition Clause . . . must forbid individual state actors from intentionally and affirmatively orchestrating sophisticated modes of total interference with Appellants' right to informally petition and communicate with their elected state representatives on any issue of concern, including the Act in this case. The Petition Clause must preserve some small quantum of effective communication between the electorate and the elected from intentional interference by other state actors. To hold otherwise is to condemn a First Amendment right to a mere privilege subject to the whims of political elites; elites who far too often are beyond the electoral reach of those whose rights they have intentionally invaded.

Aplt. Br. at 61-62.

Because these allegations and arguments are only generalized, abstract grievances held by all Pennsylvanians, the district court did not err in concluding

48

Plaintiffs lacked standing to challenge their First Amendment claim. <u>Cf.</u> <u>Goode</u>, 539 F.3d at 315, 320-22 (dismissing taxpayers' right-to-petition claim because their alleged "injuries are no different in nature from the general interest in enforcing compliance with the law which the public shares").[11]

## IV. CONCLUSION

For the foregoing reasons, we conclude Plaintiffs lack standing to pursue the federal claims they assert in this action. Therefore, we AFFIRM the district court's decision dismissing those claims.

---

[11]Appellants' Request, dated February 5, 2009, for Leave to File Post-Argument Letter Brief is denied.