**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-4584
_____

COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF PUBLIC WELFARE,
Appellant

v.

KATHLEEN SEBELIUS, SECRETARY OF HEALTH AND
HUMAN SERVICES

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-09-cv-00808)
District Judge: Honorable William L. Standish

_____

Argued October 25, 2011

Before:  FISHER, VANASKIE and ROTH, *Circuit Judges*

(Filed: March 15, 2012)

Jason W. Manne, Esq. (*Argued*)
Office of General Counsel
Department of Public Welfare
301 Fifth Avenue,
Suite 430
Pittsburgh, PA 15222
            *Counsel for Appellant*

Lindsey Powell, Esq. (*Argued*)
United States Department of Justice
Appellate Section
Room 7240
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0000

Mark B. Stern, Esq.
United States Department of Justice
Civil Division
Room 7531
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0000
            *Counsel for Appellee*

_____

OPINION
_____

VANASKIE, *Circuit Judge*.

The Pennsylvania Department of Public Welfare ("DPW") appeals a decision of the United States District Court for the Western District of Pennsylvania that sustained a directive of the United States Department of Health and

2

Human Services ("HHS") that DPW must remit to the federal government more than $5.6 million in overpayments recovered by DPW under the Aid to Families with Dependent Children ("AFDC") program. DPW also appeals the District Court's dismissal of a Freedom of Information Act ("FOIA") claim for lack of standing. Discerning no error in the District Court's rulings, we will affirm its judgment.

## I.

### A. *Statutory and Regulatory Framework*

The Aid to Families with Dependent Children ("AFDC") program was established by Title IV-A of the Social Security Act of 1935, 42 U.S.C. §§ 601-617, to assist states in providing aid to needy children and their families. The AFDC program provided for federal reimbursement of a percentage of all qualifying state expenditures, which were calculated and reported on a quarterly basis. 42 U.S.C. § 603(a)(1994). The AFDC was considered an "open-ended entitlement program" because there was no cap on the amount of federal funds a state could receive in a fiscal year, and states were reimbursed for all qualifying expenditures.

The AFDC program also established a procedure for recovering and accounting for payments that states made to recipients who were ineligible to receive them. The program required states to recover these overpayments, either by collecting direct cash repayments from the recipients, or through offsets to a future cash assistance payment. 45 C.F.R. § 233.20(a)(13). Because the AFDC recipients were needy, states generally recovered overpayments in installments over a period of time. Once the overpayments were recovered, states were required to report the amounts

3

collected in their quarterly financial reports to HHS, which was responsible for administering the program. 45 C.F.R. § 201.5(a)(3). Federal payments for future quarters were then reduced pro rata by the federal share of the amount recovered by the state in the prior quarter. 42 U.S.C. § 603(b)(2)(1994).

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996) (codified at 42 U.S.C. §§ 601 *et seq.*), which replaced the AFDC program with the Temporary Assistance for Needy Families ("TANF") grant program. TANF was designed to give states greater flexibility in administering their welfare programs while reducing total federal welfare spending. States that are eligible to participate in TANF receive an annual "block grant" from HHS, and thus, unlike the AFDC program, TANF imposes a cap on the total federal funds each participating state is entitled to receive annually.

PRWORA § 116(b)(3) establishes guidelines for the close-out of state AFDC programs during the transition to TANF. In relevant part, it provides:

> Claims made with respect to State expenditures under a State plan approved under part A of title IV of the Social Security Act (as in effect on September 30, 1995) with respect to assistance or services provided on or before September 30, 1995, shall be treated as claims with respect to expenditures during fiscal year 1995 for purposes of reimbursement even if payment was made by a State on or after October 1, 1995. Each State shall complete the filing of all claims under the State plan (as so in effect) within 2

4

years after the date of the enactment of this Act. The head of each Federal department shall— (A) use the single audit procedure to review and resolve any claims in connection with the close out of programs under such State plans.

PRWORA, Pub. L. No. 104-193, § 116(b)(3), 110 Stat. 2105 (1996).

The "single audit procedure" to which reference is made in § 116(b)(3) is established by the Single Audit Act of 1984 ("SAA"), 31 U.S.C. §§ 7501-7507. Under the SAA, "[e]ach non-Federal entity" that expends at least $300,000 of Federal awards in a fiscal year "shall have either a single audit or a program-specific audit made for such fiscal year in accordance with the requirements of this chapter." 31 U.S.C. § 7502(a)(1)(A).

The Administration for Children and Families ("ACF"), the division of HHS responsible for administering the former AFDC and current TANF programs, interpreted § 116 in a series of program instructions ("PI"s) that clarified ACF policy for the recovery of AFDC overpayments and provided the states with directions for closing out their AFDC accounts in accordance with § 116. On March 9, 1999, ACF issued PI 99-2, which required states to remit to HHS the federal share of recovered overpayments made to recipients on or before September 30, 1996, but permitted states to retain the full amount of recovered overpayments of AFDC or TANF funds paid to recipients after October 1, 1996, with the recovered overpayments to be applied towards TANF program costs. PI 99-2 also provided that states must submit the federal share of overpayments to the ACF in quarterly checks. On May 1, 2000, ACF issued PI 99-2 (Revised),

5

which permitted states to retain the full amount of recovered overpayments but stated that "the amounts recovered must be credited against the current grant in the fiscal year in which the overpayment was recovered." (A. 122-23.)

On September 1, 2000, ACF issued PI 2000-2, which rescinded PI 99-2 and PI 99-2 (Revised) and replaced them with a new overpayment recovery policy. PI 2000-2 reiterated the continuing requirement to remit the federal share of recovered AFDC overpayments. PI 2000-2 required the states to remit the federal share of pre-October 1, 1996 overpayments to ACF by check, and provided the states with instructions for making these repayments going forward. It also provided that it was only "effective for recoveries made after 9/30/96," and that "[r]ecoveries made prior to the date of this transmittal [*i.e.*, September 1, 2000] will be evaluated on reasonable interpretation of statutory requirements or any previous guidance provided by ACF." (A. 125.)

## B. Factual and Procedural Background

In August 2007, the HHS Office of Inspector General ("OIG") conducted a nationwide audit to determine whether states were complying with the requirements to reimburse the federal share of recovered AFDC overpayments made before October 1, 1996. According to the OIG report, of the 43 states reviewed, 24 states had complied with the federal requirements and reimbursed ACF for overpayment recoveries from July 2002 through June 2006, while 19 states and the District of Columbia continued to collect overpayments, but did not reimburse ACF $28.7 million for the federal share of recoveries. The OIG report recommended that ACF collect the federal share of the

6

overpayments from the states that had not complied with the reimbursement requirements.

The OIG audit found that the Pennsylvania DPW, the state agency responsible for administering the former AFDC and current TANF programs, had recovered $10,598,095 in AFDC overpayments from October 1, 1996 through June 30, 2006, but had not reimbursed ACF for the federal share of $5,609,572. Pursuant to this audit, on June 26, 2008, the OIG sent a letter to DPW requesting remittance of the federal share of $5,609,572 by check made payable to HHS within 30 days.

DPW appealed this reimbursement request, or "disallowance," to the HHS Departmental Appeals Board ("DAB" or "Board"). DPW did not contest the OIG audit findings with respect to either the amount of AFDC overpayments recovered or the calculation of the federal share. Rather, it challenged HHS' authority to conduct the audit. It argued that PRWORA § 116(b) designates the SAA as providing the exclusive audit procedure for the close-out of the AFDC program, and thus precludes HHS from requiring reimbursement based on the results of its own audit. DPW submitted declarations stating that its federal programs, including TANF, had been subject to SAA audits since 1996, and that none of the audits had taken any "exception . . . or finding . . . relative to DPW's retention of overpayment recoveries from the [AFDC] program." (A. 161.) DPW argued that HHS was bound by the results of these audits.

DPW also argued that it was entitled to retain the recovered overpayments under HHS policies. It contended that PI 2000-2 permitted it to retain the overpayments collected before September 1, 2000, because "it was not

7

unreasonable for the State to interpret" PRWORA as allowing it to do so. (A. 69.) It also claimed that it was entitled to retain the overpayments collected after September 1, 2000, because even if its retention of overpayments violated ACF policy in the various PIs, § 116 prohibited ACF from issuing such guidance documents to the states. DPW also advanced a separate argument that the DAB could not give *stare decisis* effect to its prior decisions addressing AFDC overpayments in the TANF period because the agency had not properly indexed those decisions in accordance with the Freedom of Information Act ("FOIA") requirements that agencies maintain published indices of their final decisions. 5 U.S.C. § 552(a)(2).

In a decision issued on April 16, 2009, the DAB rejected each DPW argument and upheld the HHS determination requiring DPW to remit the federal share of $5,609,572 to HHS. The DAB held that the reference to the SAA in § 116(b) does not preclude HHS from relying on the accurate results of its own audit of the states' accounting of federal grants. It also held that DPW is not entitled to retain the funds under either federal appropriations law or the statutory limits on TANF grants. The DAB also rejected the DPW challenge to its precedent, holding that the website indexing its decisions satisfies FOIA requirements.

In June 2009, DPW sought judicial review of the DAB decision in the District Court for the Western District of Pennsylvania. Count One of its Complaint challenged the agency's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), on two grounds. First, it argued that the DAB decision upholding the reimbursement directive "was not in accordance with law," reasserting its argument

8

that PRWORA designates the SAA procedure as the exclusive audit procedure. Second, it claimed that the conclusion that DPW was not entitled to retain the federal share of the AFDC overpayment recoveries under substantive law was "arbitrary, capricious and contrary to law." (A. 20.) Count two raised a FOIA claim based on HHS' alleged failure to maintain an adequate published index of its prior decisions. While DPW conceded that it was not prejudiced by this alleged failure in the instant dispute, it sought ongoing injunctive relief to compel HHS to comply with FOIA requirements.

In an order entered on October 14, 2010, the District Court granted summary judgment for HHS on both counts. On Count One, the Court first held that the DAB reasonably rejected DPW's "procedural" argument, concluding that there was no support for the assertion that PRWORA prohibits HHS from conducting its own audit. The District Court next held that the conclusion that DPW was not substantively entitled to retain the federal share of the recovered overpayments was not arbitrary, capricious, or contrary to law. On Count Two, the District Court held that DPW lacked standing to raise the FOIA claim because it had alleged no injury from the allegedly inadequate indices. DPW now appeals the District Court's decision.

## II.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We apply *de novo* review to a district court's grant of summary judgment in a case brought under the APA, "and in turn apply the applicable standard of review to the underlying agency decision." *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 195-96 (3d Cir. 2010). The

9

underlying agency decision is reviewed under the APA, which requires courts to set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that was conducted "without observance of procedure required by law."[1]   5 U.S.C. §§ 706(2)(A) & (D); *Chao v. Roy's Const., Inc.*, 517 F.3d 180, 186 (3d Cir. 2008).  With respect to the grant of summary judgment on the FOIA claim, we review dismissals for lack of standing under a *de novo* standard.  *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009).

## III.

Section 603(b)(2) of Title 42 describes the methods for computing federal payments to the states and provides that the amount shall be:

---

[1] DPW's challenge to the DAB's interpretation of PRWORA's transition provision raises the question whether deference is appropriate under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  The District Court concluded that *Chevron* deference is inapplicable (see A. 45-53), and although HHS does not raise this issue, DPW contends that the DAB decision is not entitled to deference.  (DPW Reply at 1-2).  Recently, we held that the DAB's interpretation of statutory provisions that are part of the Medicaid program is entitled to *Chevron* deference.  *See Pa., Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Services*, 647 F.3d 506, 510-11 (3d Cir. 2011).  We find it unnecessary to decide whether our recent decision is applicable in the context presented here, as we find that the DAB decision withstands plenary review.

10

> [R]educed by a sum equivalent to the pro rata share to which the United States is equitably entitled, as determined by the Secretary of Health and Human Services, of the net amount recovered during any prior quarter by the State or any political subdivision thereof with respect to aid to families with dependent children furnished under the State plan.

42 U.S.C. § 603(b)(2)(B) (repealed). Although PRWORA repealed most of the AFDC, § 116(b)(2) preserves certain powers and responsibilities under the AFDC, including:

> [A]dministrative actions and proceedings commenced before such date [of the AFDC's repeal], or authorized before such date to be commenced, under such provisions.

42 U.S.C. § 116(b)(2)(B). The HHS letter requesting remittance of the federal share of AFDC overpayments made through September 30, 1996, is a collection proceeding that was "authorized . . . to be commenced" before the AFDC was repealed. Specifically, 45 C.F.R. § 74.72(a) provides:

> (a) The closeout of an award does *not* affect any of the following: (1) the right of the HHS awarding agency to disallow costs and recover funds on the basis of a later audit or other review. (2) The obligation of the recipient to return any funds due as a result of later refunds, corrections, or other transactions.

11

(Emphasis added). Thus, even after "[t]he closeout of an award," this regulation preserves both HHS' authority "to disallow costs and recover funds on the basis of a later audit," and DPW's obligation, as a recipient of funds, "to return any funds due as a result of later refunds." *Id.*

The statutory scheme therefore authorizes HHS' disallowance letter and establishes at the very least its presumptive entitlement to the requested funds. DPW challenges this conclusion by advancing various legal theories why the reimbursement directive was unauthorized, and why, in any event, DPW is entitled to retain the funds. For the reasons set forth herein, we reject each of these arguments.

DPW challenges HHS' authority to require the disallowance by claiming that PRWORA's transition provision, § 116(b)(3)(A), prohibits it. Section 116(b)(3)(A) provides:

> The head of each Federal department shall—(A) use the single audit procedure to review and resolve *any claims in connection with the close out of programs* under such State plans.

(Emphasis added). Emphasizing the seemingly mandatory "shall use" and broad "any claims" language, DPW interprets this provision to mean that HHS must rely on the results of audits conducted pursuant to the SAA procedure in resolving all claims relating to the close-out of the AFDC program— including federal claims for the federal share of recovered AFDC overpayments. Accordingly, DPW reasons that this provision prohibits the HHS reimbursement demand, which relied on the result of the OIG audit. Moreover, DPW argues

that since HHS is bound by the results of the SAA audits, which took no exception to DPW's failure to remit the federal share of its AFDC overpayments between October 1996 and June 2006, HHS has no authority for its demand.

DPW argues that this interpretation is consistent with PRWORA's overall statutory scheme and purpose. As evidence of this purpose, DPW cites 42 U.S.C. § 617, which provides:

> No officer or employee of the Federal Government may regulate the conduct of States under this part or enforce any provision of this part, except to the extent expressly provided in this part.

This section narrowly circumscribes the scope of HHS authority with regard to TANF, and the legislative history of this provision evinces Congress' intent in this regard:

> Many States are highly critical of the current welfare system's lack of flexibility and high degree of Federal regulation. This provision is designed to *explicitly restrict* the ability of Federal officials to regulate State block grant programs, except as specifically provided under the committee proposal.

House Report 104-651, at 1371 (emphasis added). However, the language of § 617 and the legislative history indicate that this provision limits HHS authority only with respect to TANF, and not with respect to the AFDC program. Accordingly, this provision does not affect our interpretation of HHS authority to disallow AFDC overpayments.

13

DPW also asserts that § 116(b)(2)(B), discussed *supra*, "prohibit[s] HHS from issuing any new policies relative to the AFDC program that would bind the single auditors." (DPW Br. at 16.) DPW reasons that these provisions and the legislative history reflect Congress' intent to create a "'hands off' approach to Federal interference" with TANF. (*Id.*) It argues that § 116(b)(3)(A) should be construed, consistent with the overall statutory purpose, as prohibiting HHS from relying on its own audit procedures in resolving AFDC-related claims.

DPW's interpretation of the pertinent statutory provisions is only plausible when the language of § 116(b)(3)(A)—particularly the "shall use" and "any claims" terms—is read in isolation from the relevant statutory context and definitions. We, however, agree with the DAB and District Court that the meaning of the provision must be determined in light of the relevant statutory context. Following this approach, we concur with their interpretation of § 116(b)(3)(A) as permitting HHS to conduct its own audits in addition to the single audit procedure employed by DPW. We reach this interpretation after identifying two flaws in DPW's interpretation of the provision.

## A. "Any Claims"

First, we conclude that § 116(b)(3)(A)'s directive—to use the SAA procedure to resolve "any claims" connected with the close-out of AFDC programs—does not apply to federal claims for the federal share of recovered AFDC overpayments. DPW's contrary interpretation depends on reading the words "any claims" in isolation from the relevant context. As the District Court observed, the phrase "any

14

claims" must be considered in the context of the entirety of § 116(b)(3), which provides:

> CLOSING OUT ACCOUNT FOR THOSE PROGRAMS TERMINATED OR SUBSTANTIALLY MODIFIED BY THIS TITLE. — In closing out accounts, Federal and State officials may use scientifically acceptable statistical sampling techniques. Claims made with respect to State expenditures under a State plan approved under part A of title IV of the Social Security Act (as in effect on September 30, 1995) with respect to assistance or services provided on or before September 30, 1995, shall be treated as claims with respect to expenditures during fiscal year 1995 for purposes of reimbursement even if payment was made by a State on or after October 1, 1995. *Each State shall complete the filing of all claims* under the State plan (as so in effect) within 2 years after the date of the enactment of this Act.

(Emphasis added). The following subpart, § 116(b)(3)(A), then provides that "[t]he head of each Federal department shall—(A) use the single audit procedure to review and resolve any claims in connection with the close out of programs under such State plans." Thus, the words "any claims in connection with the close out of programs" appear in the context of a provision that discusses "claims" exclusively in terms of state claims: claims that *states* must file for *state* expenditures made under *state* plans. Moreover, the subsequent subpart of § 116(b)(3) reinforces the exclusive focus of this provision on "state" claims:

15

> The head of each Federal department shall— . . . (B) reimburse States for any payments made for assistance or services provided during a prior fiscal year from funds for fiscal year 1995, rather than from funds authorized by this title.

§ 116(b)(3)(B). Thus, the surrounding statutory text indicates that this provision is concerned with claims that the states make for reimbursement from the federal government for their expenditures under the AFDC program.

That the phrase "any claims" in § 116(b)(3)(A) refers to claims asserted by a state is made especially clear in the sentence immediately preceding § 116(b)(3)(A). This sentence establishes the filing deadline for state claims, *i.e.*, two years after the enactment of the legislation. ACF explained this requirement in PI 97-4, which "provide[d] guidance to States for the closeout of the AFDC" and detailed some of the procedures for transitioning to TANF in accordance with § 116. (A. 211.) Explaining the meaning of this sentence, PI 97-4 noted: "*all expenditures that a State claims* pursuant to these instructions" must, among other requirements, "meet the two year limit for filing claims for expenditures, in accordance with Section 1132 of the Social Security Act and 45 CFR Part 95, Subpart A." (A. 211 (emphasis added).)

Section 1132 of the Social Security Act provides for a two-year period for filing "*any claim by a State for payment with respect to an expenditure made* during any calendar quarter *by the State*—(1) in carrying out a State plan . . . ." 42 U.S.C. § 1320b-2(a) (emphasis added). Additionally, 45 C.F.R. § 95.4 defines "claim" as follows: "In this subpart— . . . *Claim means a request for Federal financial participation* in

16

the manner and format required by our program regulations, and instructions and directives issued thereunder." 45 C.F.R. § 95.4 (emphasis added).

Section 116(b)(3) is focused exclusively on state claims for federal reimbursement. None of the surrounding statutory language contemplates federal claims for states to repay the federal share of recovered AFDC overpayments. Furthermore, the two-year filing period plainly could not contemplate HHS claims for state-recovered AFDC overpayments given the fact that recoupment of overpayments from welfare beneficiaries occurs over a course of many years.

DPW contends that "[w]hen Congress wants to refer to State claims, it customarily uses the modifier 'state' in close conjunction with the word 'claim,'" and points out that this modifier "state" "appears throughout § 116(b)(3), **except** in the clause at § 116(b)(3)(A)." (DPW Br. at 17.) It concludes: "Had Congress wanted to tie back the words 'any claims' to the earlier references to state claims, it would have said 'HHS shall use the single audit procedure to review and solve **such** claims.'" (*Id.*) This argument invokes an *expressio unius* type of logic: that the inclusion of "state" in the preceding discussion of claims is purposeful, and therefore, so too is the omission of this qualifier in the ensuing subpart.

Even assuming *arguendo* that Congress "customarily" refers to state claims by including "state" in close conjunction with "claim"—a sweeping hypothesis about statutory writing for which DPW offers no evidence—it does not follow that Congress would include that modifier where it is evident from the context that it refers to state claims. In any event, we do not agree that "any claims" is unconnected to the word "state"

in § 116(b)(3)(A). In fact, this provision makes such a link, as it says: "any claims *in connection with* the close out of programs under such State plans." § 116(b)(3)(A). This language tracks the preceding sentence, which makes clear the type of claims that are "in connection with the close out": "all claims under the State plan" that states must file within a two-year deadline. § 116(b)(3). Indeed, the reference to "such State plans" indicates that § 116(b)(3)(A) clearly refers back to this preceding sentence, which was concerned only with "state" claims.

DPW also challenges this interpretation by invoking the Supreme Court's statement that "the words 'any claim' are sweeping words in common usage." (DPW Br. at 17, quoting *United States v. Yellow Cab*, 340 U.S. 543 (1951).) DPW's argument, however, is untethered from the context of the *Yellow Cab* Court's statement. In *Yellow Cab*, the Court was considering whether the United States could be sued for contribution by a joint tortfeasor under the Federal Tort Claims Act when it remarked: "The words 'any claim against the United States . . . on account of personal injury' are broad words in common usage. They are not words of art." 340 U.S. at 548. Thus, the Court was considering the meaning of the words "any claim" in a statute concerning tort claims against the United States. By contrast, in the current case we consider the meaning "any claims" in the context of a provision that has narrowed the discussion to a particular category of state claims. The statement in *Yellow Cab* does not require us to disregard this context and interpret it as referring to the broad category of "any" claim that could be brought "in connection with the close out of" AFDC programs.

18

When viewed in their fixed position within the relevant context, we think the words "any claims" are reasonably read as referring to the narrower category of state claims for federal reimbursement of state expenditures, submitted within the two-year filing period. We therefore conclude that the single audit directive in § 116(b)(3)(A) does not apply to federal claims for state reimbursement of the federal share of recovered AFDC overpayments.

## B. "Shall Use"

Second, even if "any claims" does include federal claims for state reimbursement of the federal share of recovered AFDC overpayments, we nevertheless find that § 116(b)(3)(A) did not require ACF to rely on the results of SAA audits in order to require reimbursement. DPW's argument that the provision prohibits ACF from conducting its own audit is predicated on its interpretation of the "shall . . . use the single audit procedure" language as imposing a mandatory requirement on ACF to rely on the results of the single audit procedure. However, a close examination of the statutory context, including the SAA, supports the conclusion that "using" its procedure does not require exclusive reliance on it.

"[T]he single audit procedure" refers to the method for conducting audits under the SAA, which provides that method as part of a scheme for reducing the burden on federal funding recipients of complying with various audit requirements. As the SAA states: "An audit conducted in accordance with this chapter shall be in lieu of any financial audit of Federal awards which a non-Federal entity is required to undergo under any other Federal law or regulation." 31 U.S.C. § 7503(a). However, the SAA also expressly

19

preserves the authority of federal agencies to conduct their own audits:

> Notwithstanding subsection (a), a Federal agency may conduct or arrange for additional audits which are necessary to carry out its responsibilities under Federal law or regulation. The provisions of this chapter do not authorize any non-Federal entity (or subrecipient thereof) to constrain, in any manner, such agency from carrying out or arranging for such additional audits, except that the Federal agency shall plan such audits to not be duplicative of other audits of Federal awards.

31 U.S.C. § 7503(b). Therefore, while the SAA prohibits ACF from requiring DPW to conduct more than one audit of its Title IV-A program in any fiscal year, it does not restrict ACF from conducting its own audit when "necessary to carry out its responsibilities under Federal law or regulation." *Id.* Because the HHS audit was necessary to enable HHS to complete its responsibility to monitor state expenditures under the AFDC program, the HHS audit was not precluded by the SSA.

DPW resists this interpretation, reasoning that the requirement to use the SAA procedure implicitly precludes HHS from using an "exception to that procedure." (DPW Br. at 18.) We disagree. The SAA preserves a federal agency's authority to carry out additional audits as necessary, and there is no indication in § 116(b)(3)(A) that Congress intended to depart from this feature of the SAA. We do not believe that Congress would attempt to convey this purpose by referring to the SAA, which expressly preserves agency authority to

20

conduct audits. Rather, if Congress intended to designate only one part of the SAA and exclude application of the rest of the Act, we believe it would have manifested this intent more clearly. When considered in light of the SAA, the most reasonable interpretation of § 116(b)(3) is that it restricts HHS from imposing additional audit requirements on states in the process of closing out their AFDC programs, but does not preclude HHS from conducting its own audits. We therefore conclude that § 116(b)(3)(A) does not prohibit HHS from relying on the results of its own audit in order to require DPW to remit the federal share of recovered AFDC overpayments.

### C. DPW's Remaining Arguments

DPW next argues that even if HHS is not bound by the results of the single audit, Pennsylvania is nonetheless entitled to retain the federal share of recovered AFDC overpayments under substantive law. DPW advances several disjointed arguments to defend its entitlement to the funds. For the sake of clarity, we will address each of the arguments according to the asserted legal basis of the claim.

1. "Equitable Entitlement" under 42 U.S.C. § 603(b) and PRWORA § 116(b)(2)(B)

DPW argues that "whether or not HHS is entitled" to recover the federal share of Pennsylvania's recovered AFDC overpayments "depends upon whether [HHS] is 'equitably entitled'" to the funds under § 603(b) of the old AFDC statute. (DPW Br. at 20-21.) This provision stated, in relevant part, that the HHS Secretary shall compute the amount to be paid to each state, which amount shall be:

21

> [R]educed by a sum equivalent to *the pro rata share* to which the United States is *equitably entitled, as determined by the Secretary of [HHS]*, of the net amount recovered during any prior quarter by the State or any political subdivision thereof with respect to aid to families with dependent children furnished under the State plan.

42 U.S.C. § 603(b)(2)(B) (repealed) (emphasis added). DPW argues that PRWORA § 116(b)(2)(B) stripped the HHS Secretary of the authority to make this determination under the repealed AFDC, because this administrative action was not "commenced . . . or authorized . . . to be commenced" prior to the effective date of PRWORA on July 1, 1997. (DPW Br. at 20, quoting PRWORA § 116(b)(2)(B).) In this ostensible vacuum of authority, argues DPW, "it was up to the State (or the single auditors . . .) to decide whether HHS was equitably entitled to a refund." (*Id.* at 21.) Since "[n]either of these parties made such a determination," DPW neatly concludes that it is entitled to retain the funds. (*Id.*)

First, we agree with the view taken by the District Court, which rejected DPW's contention that § 603(b) required the HHS Secretary to make an "explicit finding of equitable entitlement." (A. 31.) Second, we reject DPW's claim that § 116(b)(2) stripped HHS of its authority to seek reimbursement. To the contrary, as discussed *supra*, § 116(b)(2)(B) preserves HHS' authority to disallow the federal share of recovered AFDC overpayments because it was a collection proceeding that was authorized under 45 C.F.R. § 74.72(a) to be commenced prior to PRWORA's effective date. Even if it were not the case that PRWORA preserves

22

HHS' authority in this regard, we are not persuaded by DPW's claim that the equitable entitlement determination would fall by default to DPW or the single auditors. DPW offers no explanation for this conclusion, and we discern no plausible basis for it.

### 2. Unambiguous Statutory Repayment Conditions

DPW next argues that it is not required to reimburse HHS because the repayment obligation was not stated unambiguously in the AFDC, and is therefore invalid.[2] For this proposition it cites *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1 (1981), and its progeny, which upheld Congress' power to attach conditions to federal grants to states so long as the conditions are stated unambiguously. 451 U.S. at 17. To determine whether a statute satisfies this clarity requirement, courts "ask whether . . . a state official would clearly understand . . . the obligations" of the law, and "whether the [statute] furnishes clear notice regarding the

---

[2] While DPW acknowledges that it "did not argue for the grant-law standard for review below," it insists that "a party cannot waive the proper standard for review in the Court of Appeals" and accordingly this Court "has an obligation to apply the correct legal standard." (DPW Reply at 3, n. 2, citing *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 290 (3d Cir. 2010) ("[W]hether an incorrect legal standard has been used . . . is an issue of law to be reviewed *de novo*.")). DPW's argument appears to be substantive, rather than a standard for review of a claim. We need not resolve that issue, however, because DPW's argument lacks merit.

liability at issue in [the] case." *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

DPW asserts that "the question before the Court thus reduces to whether the old AFDC statute, as modified by the transition provision of PRWORA, unambiguously requires Pennsylvania to make repayment of the Federal portion of the AFDC overpayment collections." (DPW Reply at 2-3.) DPW contends that "[t]here is no unambiguous repayment condition in the statute," and effectively reasserts its arguments about 42 U.S.C § 603(b) and PRWORA § 116(b)(2). (*Id.* at 3.) It claims that 42 U.S.C. § 603(b)(2), which required the states' funds to be reduced by the "pro rata share to which the United States is equitably entitled, as determined by the [HHS] Secretary," does not impose a mandatory repayment obligation, but rather calls for a "discretionary determination." (*Id.*) DPW then argues that § 116(b)(2) revoked the Secretary's authority to determine whether HHS was "equitably entitled" to repayment, and that the authority to make this decision was transferred to the single auditors, who "made no such determination here." (*Id.*)

DPW's argument relies on misunderstandings of both the *Pennhurst* clear notice requirement and § 603(b)(2). The rationale underlying the *Pennhurst* requirement is that, because a conditional grant is akin to a contract, recipients of federal funds should accept the attached conditions "voluntarily and knowingly." 451 U.S. at 17. "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17). Yet, DPW does not demonstrate that it was unaware or unable to ascertain that §

24

603(b)(2) created a repayment obligation. DPW's only argument in this regard—that the repayment obligation depended on the Secretary's "discretionary determination that HHS was 'equitably entitled' to return of the money"—is unavailing. (DPW Reply at 3.) Section 603(b)(2)(B) provides clear notice to states that the federal payments they receive will be "reduced by a sum," *i.e.*, the share to which the federal government is "equitably entitled." The fact that the Secretary is responsible for determining the amount of this federal share in no way renders the condition ambiguous. Even assuming that this determination is "discretionary," this does not run afoul of *Pennhurst*, which merely requires that states have clear notice of conditions on accepting federal funds, and imposes no requirement that such conditions be unconditional.

### 3. HHS Program Instructions

DPW also argues that the program instructions HHS issued during the TANF period authorized DPW to retain the disallowed funds. DPW cites PI 2006-03, which ACF issued on June 20, 2006, and which stated that a state's retention of recoveries made prior to the date of that transmittal would be evaluated "on reasonable interpretation of statutory requirements." (A. 133.) DPW argues that because its interpretation of the statute "is reasonable, so it is entitle [sic] to retain the AFDC overpayment collections." (DPW Br. at 23.) In this regard it asserts, without citation to any authority, that "[t]o demonstrate reasonableness the Court need only ask itself if the arguments for state retention of the money would be sustained if HHS advanced them," and unsurprisingly concludes that in its case, "[i]t should be clear that they would." (*Id.*) DPW then reasons that "[s]ince HHS is bound

25

by its own guidance saying that it would accept any reasonable interpretation of PWORA . . . Pennsylvania is entitled to retain the funds." (*Id.*, citation omitted.)

The District Court rejected DPW's argument that it "reasonably interpreted PI 99-2 (Revised) to permit retention of the AFDC overpayments" recovered before September 1, 2000. (A. 23.) The District Court correctly held that PI 99-2 (Revised) required states to credit the federal share of recovered AFDC overpayments "against the TANF grant in the fiscal year in which the overpayments were recovered." Because DPW "supplemented its TANF grants" with the funds, rather than crediting them, it did not reasonably rely on that program instruction. (A. 24.)

### 4. Federal Appropriations Law under 31 U.S.C. § 1301(a)

DPW also argues that the District Court erred in upholding the DAB's decision that the State had no right to retain the federal share of the AFDC overpayment recoveries under Federal appropriations law. Section 1301(a) provides that Federal "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). Before the DAB and District Court, DPW acknowledged that its use of the recovered AFDC overpayments made before September 30, 1996 to supplement its TANF grant was a violation of general appropriation law, but argued that an exception to this general law applied. The DAB and District Court both rejected this argument because the exception was inapplicable, and DPW failed to identify any other statutory provision which supersedes §1301(a) to permit its use of AFDC funds for the TANF program.

26

In defense of its retention of AFDC funds for its TANF program, DPW first contends that § 1301(a) "governs how Federal agencies spend money, not what recipients of Federal funds do with money after it is paid." (DPW Br. at 21.) In support of this claim, DPW offers only "the fact that [sic] title of the United States Code subchapter in which this provision is located is entitled 'The Budget Process,'" and reasons that a contrary conclusion would "make an appropriations act violation out of every use of Federal funds by an ultimate recipient contrary to the intended purpose." (*Id.*)

DPW's interpretation of federal appropriations law—in support of which it cites no substantive authority—is contrary to the commonly understood principle that public funds "may be used only for the purpose for which they were appropriated." (HHS Br. at 16, citing Principles of Federal Appropriations Law, 2d ed., U.S. General Accounting Office, July 1991, OGC-91-5, at 4-2.) Moreover, as HHS observes, because DPW "'d[id] not dispute [in District Court] that its use of the'" AFDC funds for TANF program costs "'violated general Federal appropriations law,'" it has waived its opportunity to raise a contrary argument now. (*Id.* at 17, quoting A. 21.)

DPW next contends that if federal appropriations law applies, it complied with it by applying AFDC funds to the TANF program, which benefited the same "objects" of the AFDC appropriation: "needy families with children." (DPW Br. at 22.) However, as we just explained, DPW waived this argument when it failed to dispute that its use of AFDC funds for the TANF program violated federal appropriations law. In any event, the merits of this argument are unavailing,

because despite sharing similar purposes, AFDC and TANF are distinct statutes with separate appropriations, and DPW cites no statutory provision which purports to authorize the use of AFDC funds to supplement the TANF program.

Finally, DPW argues that § 1301 "does not apply where 'otherwise provided by law,'" and maintains that the repealed AFDC statute "allows States to retain the overpayment collections unless there is a determination that HHS is 'equitably entitled' to a refund." (DPW Br. at 22.) We conclude that DPW has also waived this argument, which it did not raise before the agency. *See United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37-38 (1952); *Dir., Office of Workers' Comp. Programs v. N. Am. Coal Corp.*, 626 F.2d 1137, 1143-44 (3d Cir 1980).

5. TANF Spending Cap under 42 U.S.C. § 603(a)(1)

As part of the tradeoff of state flexibility for reduced federal welfare spending, 42 U.S.C. § 603(a)(1) provides for a dollar limit, or "cap," on the federal TANF funds that a state can receive in a fiscal year. Before the DAB and District Court, DPW argued that it was entitled to retain the AFDC funds recovered before September 1, 2000 because DPW's retention of the federal share of recovered AFDC overpayments did not exceed the TANF cap on federal funds. In this regard, DPW claimed that the annual State Family Assistance Grant ("SFAG") does not set the cap on funds a state may receive under TANF, because states may be eligible for a bonus, supplemental grant, or contingency funds. The District Court and DAB properly rejected "this possibility [as] meaningless," reasoning that, while a state's annual TANF funds may be increased beyond the SFAG by a bonus,

28

supplemental grant, or contingency funds, these amounts are determined by "a statutory formula under Title IV," and thus the statute still imposes a dollar cap on a state's annual federal TANF grant. (A. 25.) They concluded that DPW "may not . . . exceed[] [this cap] by using AFDC overpayment recoveries to supplement those funds." (A. 25.) We agree with this interpretation of the TANF dollar cap, and since DPW offers no persuasive argument to defeat this interpretation, we conclude that the District Court did not err.

## IV.

### A. *Lack of Standing to Pursue a FOIA Claim*

Turning to its FOIA claim, DPW argues that the District Court erred in granting summary judgment against it on the grounds that it lacked standing. The gist of DPW's claim is that FOIA requires agencies to publish "current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published." 5 U.S.C. § 552(a)(2). DPW asserts that the DAB fails to satisfy its duties under this requirement because it provides only a listing of decisions and a key word search engine on the agency's website.

HHS challenged DPW's standing to raise this issue before the District Court, and DPW responded with a Rule 56(f) motion and declaration. The declaration asserted that the lack of an index prevented it from effectively representing itself before the DAB, because its counsel could not conclusively determine whether it had found all relevant precedent on the search engine. The declaration also claimed that the search engine's key-word search function was

29

inadequate because the DAB decisions do not use uniform wording. DPW offered an example of a principle that could not be searched by word, but could be categorized by topic.

The District Court did not consider the merits of this claim, and instead dismissed it for lack of standing due to its failure to allege an adequate injury, explaining:

> PA DPW has failed to cite a single instance in which the alleged inadequacy of the DAB's "index" of its final decision under FOIA has resulted in its failure to find a prior DAB decision which would have been advantageous to PA DPW in an appeal before the DAB. As a result, this case is simply not the proper case to challenge generally the sufficiency of the DAB's "index" of its final decisions.

(A. 35-36.)

To establish standing to sue, a plaintiff has the burden of establishing an "injury in fact": a harm that is both concrete and particularized, either actual or imminent, and not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In *Cervase v. Office of the Fed. Register*, 580 F.2d 1166 (3d Cir. 1978), a lawyer sought to compel the Office of the Federal Register to compile an index of the Code of Federal Regulations. He argued that the Table of Contents to the Code made it "almost impossible for [him] to know which federal regulations appl[ied] to [him.]" *Id.* at 1167. We held that the lawyer had standing under FOIA because "[t]he Federal Register Act was intended to confer upon the general public rights of access to agency rulings," and this was clearly intended to benefit a "practicing attorney,

who by virtue of his profession must advise others about their legal rights." *Id.* at 1172. Therefore, we found that the lawyer's "inability to retrieve information from the Federal Register" was an injury-in-fact. *Id.*

In *Pa. Dep't of Pub. Welfare v. United States Dep't of Health & Human Services*, No. 99-175, 2001 U.S. Dist. LEXIS 3492 (W.D. Pa. Feb 7, 2001) (hereinafter, "Pennsylvania"), then-District Court Judge D. Brooks Smith held that DPW was injured by the DAB's failure to index certain policy statements. 2001 U.S. Dist. LEXIS 3492, at *63-64. The Court observed that "[w]ithout current or complete indices . . . the [state] is unable to determine precisely what rules and regulations govern its conduct and is without sufficient information to structure its AFDC, EA, and TANF programs in the future." *Id.* As a result, the state was injured because it was "deprived of information" that Congress intended it to have. *Id.*

However, the harms that DPW alleges in the case at bar are not equivalent to the injuries-in-fact in these cases. In its Rule 56(f) declaration, DPW described the various ways in which it was injured by the DAB's allegedly inadequate index. It explained that "the lack of an index has hampered [DPW counsel's] effective representation of DPW before the DAB." (A. 237.) It elaborated that the key word searchable website was inadequate, because DPW's counsel

> [O]ften want[s] to find DAB cases setting forth the principle that a State's interpretation of an ambiguous statute, regulation, or state plan is entitled to prevail over a Federal interpretation if the State has not been given notice of the Federal interpretation. Those cases are difficult

31

> to locate by key word because the DAB does not use uniform wording in discussing the issue.

(A. 238.) Thus, DPW generally asserts that the lack of an index causes it difficulty, and the specific harm it claims as a result is that its counsel "can never be certain that [it has] located all important DAB decisions on a topic because sometimes the topic is not susceptible to a key-word search." (A. 237-38.) DPW insists that these allegations are "more than an 'unsupported assertion' that the lack of an index hampered legal research." (DPW Reply at 7.)

We disagree. There is a meaningful distinction between the "difficulties" that DPW identifies and the harms that were sufficient to qualify as injuries in *Cervase* and *Pennsylvania*. Although DPW claims the lack of an index "hampered [DPW counsel's] effective representation of DPW before the DAB," it offers only a general description of the challenges of searching, explaining that some "cases are difficult to locate by key word," and that it "can never be certain" that it has found everything. (A. 237-38.) Yet, such vague and indefinite allegations are inadequate to establish injury-in-fact, and DPW does not cure this deficiency by identifying any concrete information or cases that it was unable to find, or any other description of how this inability actually hampered its representation before the DAB.

While the key word search function may be inconvenient and create some uncertainty in the research process, there is no indication that DPW suffered any disadvantage due to the lack of an index. In fact, DPW was able to locate all of the DAB precedents relevant to its proceeding, and although it asserts that its counsel has "practiced before the DAB for nearly thirty years" and

32

"handled dozens of cases in the DAB," it does not offer a single example of when it was unable to locate relevant decisions in other cases. Since the lack of an index has not made it "almost impossible" for DPW to find relevant DAB precedent, we conclude that the District Court did not err in concluding that DPW lacks standing.

## B. Rule 56(f) Decision[3]

There remains one final claim that DPW asserts to defend its standing. DPW argues that at the Rule 56(d) stage, "it was not necessary for [it] to identify a particular case where it was prejudiced by the lack of an index before the DAB. The declaration only needed to specify what particular information was sought and how it would preclude summary judgment." (DPW Br. at 27.) It argues that the District Court "should have allowed [it] to take depositions or other discovery to obtain evidence to show injury." (DPW Reply at 8.) It also asserts that Rule 56(d) "motions are usually

---

[3] DPW styled its June 16, 2010 motion to the District Court as a "Rule 56(f) Motion," (A. 235-39), and the District Court evaluated it under the standards applied to Rule 56(f) motions. (A. 43-45.) As part of a general restyling of the Federal Rules of Civil Procedure in December 2007, the language of Rule 56(f) was amended and incorporated into Rule 56(d). *See* Fed. R. Civ. P. 56(d). These amendments were "intended to be stylistic only," and Rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)." (Advisory Committee Notes, Fed. R. Civ. P. 56(d)). Therefore, although DPW's briefs and much of the caselaw refer to the language of Rule 56(f), these changes do not alter our substantive legal analysis.

granted as a matter of course." (*Id.,* citing *Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d Cir. 2006).)

When a party opposing summary judgment "believes that s/he needs additional time for discovery, [Rule 56(d)] specifies the procedure to be followed." *Dowling v. City of Phila.*, 855 F.2d 136, 139 (3d Cir. 1988). Specifically, Rule 56(d) states:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: — . . . (2) allow time to obtain affidavits or declarations or to take discovery.

Fed. R. Civ. P. 56(d). We have interpreted this provision to require "a party seeking further discovery in response to a summary judgment motion [to] submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Dowling*, 855 F.2d at 139-40. DPW, however, submitted no such affidavit. Thus, the District Court properly dismissed the FOIA claim for lack of standing.

## V.

For the foregoing reasons, we will affirm the District Court's judgment.

34